**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

PEDRO ENRIQUE MEDEL,

                Plaintiff,

      vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social
Security,

                Defendant.

) Case No. EDCV 13-2052-JPR
)
)
) **MEMORANDUM OPINION AND ORDER**
) **AFFIRMING COMMISSIONER**
)
)
)
)
)
)

**I.   PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Disability Insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed July 3, 2014, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and judgment is entered in her favor.

1

## II.   BACKGROUND

Plaintiff was born November 27, 1969.  (Administrative Record ("AR") 148.)  He completed the 12th grade and worked as a machine operator at three different companies and general helper at a company that produced cardboard boxes.  (AR 166-67.)

Plaintiff filed an application for DIB on February 1, 2010. (AR 71, 148-51.)  He alleged that he had been unable to work since October 10, 2008, because of a "[b]ack and legs injury," "numbness in both hands," and headaches.  (AR 165.)  After his application was denied, he requested a hearing before an Administrative Law Judge.  (AR 90.)  A hearing was held on January 30, 2012, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (AR 32-70.) In a written decision issued August 2, 2012, the ALJ found that Plaintiff was not disabled.  (AR 14-27.)  On September 11, 2013, the Appeals Council denied Plaintiff's request for review.  (AR 1-3.)  This action followed.

## III.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.

2

1  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

2  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether

3  substantial evidence supports a finding, the reviewing court

4  "must review the administrative record as a whole, weighing both

5  the evidence that supports and the evidence that detracts from

6  the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,

7  720 (9th Cir. 1996).  "If the evidence can reasonably support

8  either affirming or reversing," the reviewing court "may not

9  substitute its judgment" for that of the Commissioner.  Id. at

10 720-21.

11 **IV.  THE EVALUATION OF DISABILITY**

12      People are "disabled" for purposes of receiving Social

13 Security benefits if they are unable to engage in any substantial

14 gainful activity owing to a physical or mental impairment that is

15 expected to result in death or which has lasted, or is expected

16 to last, for a continuous period of at least 12 months.  42

17 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

18 (9th Cir. 1992).

19      A.  The Five-Step Evaluation Process

20      The ALJ follows a five-step sequential evaluation process in

21 assessing whether a claimant is disabled.  20 C.F.R.

22 § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th

23 Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the

24 Commissioner must determine whether the claimant is currently

25 engaged in substantial gainful activity; if so, the claimant is

26 not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

27 If the claimant is not engaged in substantial gainful activity,

28 the second step requires the Commissioner to determine whether

3

the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v).  That determination comprises the fifth and

---

[1]RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

final step in the sequential analysis.   § 404.1520; <u>Lester</u>, 81
F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

  B. <u>The ALJ's Application of the Five-Step Process</u>

  At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since October 10, 2008, his alleged
onset date.  (AR 16.)  At step two, the ALJ concluded that
Plaintiff had severe impairments of "chronic cervical strain with
mild degenerative disc disease; chronic lumbosacral strain with
mild degenerative disc disease; chronic bilateral knee strain;
chronic bilateral wrist strain; and obesity."  (<u>Id.</u>)
The ALJ found that Plaintiff's left-knee osteoarthritis,
gastrointestinal issues, and depression were not severe (AR 16-
18), findings Plaintiff does not challenge.  At step three, the
ALJ determined that Plaintiff's impairments did not meet or equal
a Listing.  (AR 18.)  At step four, she found that Plaintiff
retained the RFC to perform "light work," specifically, he could
"lift 20 pounds occasionally and 10 pounds frequently; he can
stand and walk for six hours out of an eight-hour workday and sit
for six hours out of an eight-hour workday," and he was "limited
to frequent gross handling and fingering."[2]  (AR 19.)  Based on
the VE's testimony, the ALJ concluded that Plaintiff was able to
perform his past relevant work as an "extension edger" as

---

  [2]"Light work involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10
pounds."  § 404.1567(b).  "Even though the weight lifted may be
very little, a job is in this category when it requires a good deal
of walking or standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg controls."  <u>Id.</u>
A person who can do light work can generally also do sedentary
work.  <u>Id.</u>

generally performed in the regional and national economies.  (AR
26.)  The ALJ therefore concluded that Plaintiff was not
disabled.  (AR 26-27.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) evaluating the
medical evidence, (2) assessing his credibility, and (3)
"develop[ing] and analyz[ing]" the vocational evidence.  (J.
Stip. at 3-4.)

A.   <u>The ALJ Did Not Err in Assessing the Medical Evidence</u>

Plaintiff argues that the ALJ "failed to properly consider
relevant medical evidence which is supportive of [Plaintiff's]
claim of disability" (<u>id.</u> at 4), including evidence of his
meniscus tears and parts of Dr. Kim's opinion (<u>id.</u> at 5-6).  For
the reasons discussed below, reversal is not warranted on this
ground.

1.   <u>Applicable law</u>

A district court must uphold an ALJ's RFC assessment when
the ALJ has applied the proper legal standard and substantial
evidence in the record as a whole supports the decision.  <u>Bayliss
v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must
consider all the medical evidence in the record and "explain in
[her] decision the weight given to . . . [the] opinions from
treating sources, nontreating sources, and other nonexamining
sources."  20 C.F.R. § 404.1527(e)(2)(ii); <u>see also</u>
§ 404.1545(a)(1) ("We will assess your residual functional
capacity based on all the relevant evidence in your case
record."); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)
(same).  In making an RFC determination, the ALJ may consider

those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC any findings from treating-physician opinions that were "permissibly discounted").

2.   Relevant facts[3]

On February 16, 2008, an MRI of Plaintiff's left knee revealed "[m]inimal tricompartmental osteoarthritic changes" and "an oblique tear of the posterior horn of the medial meniscus extending to the inferior articular surface."  (AR 248.)  An MRI of Plaintiff's right knee showed an "[o]blique tear of the posterior horn of the medial meniscus extending to the inferior articular surface."  (AR 250.)

On July 16, 2008, Dr. David S. Kim, who was board certified in orthopedic surgery, reviewed Plaintiff's medical records and completed an orthopedic examination as part of Plaintiff's workers' compensation case.[4]  (AR 205-33.)  Dr. Kim noted that "clinical examination of [Plaintiff's] cervical spine reveals

_____

[3]Because the parties are familiar with the facts, they are summarized only to the extent relevant to this contested issue.

[4]Dr. Kim was apparently selected by agreement of both parties to examine Plaintiff and render an opinion as to his impairments and limitations. (See AR 205 (Dr. Kim's notation that he performed evaluation "in [his] capacity as AGREED MEDICAL EVALUATOR")); see also Cal. Labor Code § 4062.2 (procedure for parties in workers' compensation case to together select "agreed medical evaluator").

complaints of tenderness and loss of cervical range of motion,"
but orthopedic testing was negative and x-rays were normal.  (AR
217.)  He found that examination of Plaintiff's "bilateral
hands/wrists reveal[ed] some loss of range of motion and
complaints of tenderness," but "Tinel sign and Phalen testing at
this time are negative with no clinical indication of an
underlying problem such as carpal tunnel syndrome."[5]  (Id.)  Dr.
Kim noted that examination of Plaintiff's low back revealed
"complaints of tenderness with limited and painful range of
motion," but straight-leg-raising was "negative for a radicular
problem."  (Id.)  He further noted with regard to Plaintiff's low
back that electrodiagnostic studies revealed "some
abnormalities," but they were "not correlated by clinical
examination or the MRI study which only reveals 1 mm disc bulges
at two levels with no impingement on neural structures."  (Id.)

Finally, Dr. Kim found that examination of Plaintiff's knees
revealed "complaints of tenderness, as well as bilateral knee
discomfort with attempts at squatting and positive McMurray
maneuver which appears consistent with the MRI studies, revealing
tears to the posterior horns of the medial menisci."[6]  (Id.)  Dr.

---

[5]Tinel's sign and Phalen's sign tests are used to diagnose
carpal tunnel syndrome.  Carpal Tunnel Syndrome Health Center,
WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-
exam-for-carpal-tunnel-syndrome (last updated Oct. 2, 2012).

[6]The McMurray's test is used to diagnose meniscal pathology
within the knee joint.  Wayne Hing et al., Validity of the
McMurray's Test and Modified Versions of the Test: A Systematic
Literature Review, 17 J. Manual & Manipulative Therapy 22-35
(2009), available at http://www.ncbi.nlm.nih.gov/pmc/articles/
PMC2704345/.

Kim opined that Plaintiff "should avoid very heavy work activities, as well as any activities involving repetitive forceful gripping, grasping, or torquing, and any activities involving prolonged walking or standing." (AR 221.)

On November 12, 2008, Dr. Kim examined Plaintiff and completed a follow-up evaluation (AR 235-44), noting Plaintiff's report that his condition was "essentially unchanged" from the time of the July 2008 evaluation (AR 243). Dr. Kim diagnosed "[c]hronic cervical sprain/strain"; "[c]hronic bilateral wrist strain"; "[c]hronic lumbosacral sprain/strain, superimposed upon 1 mm disc protrusion at L4-5 and L5-S1 per MRI"; "[s]tatus post lower extremity contusions with bilateral knee strains," and "[o]blique tears of the posterior horns of medial menisci, per MRI studies." (AR 242.)

Dr. Kim noted that at the time of his July 2008 evaluation, Plaintiff had been performing "modified work duties" that had restricted him from lifting more than 20 pounds and provided "a ten minute break after 1.5 hours of work." (AR 243.) On October 10, 2008, however, Plaintiff had been "placed off work as modified duties were no longer available." (Id.) Dr. Kim found that Plaintiff's modified work duties fell "within the recommended work restrictions" stated in his July 2008 evaluation, and he "believe[d] [Plaintiff] was capable of performing" them. (Id.) Dr. Kim opined that "[f]ollowing review of [Plaintiff's] entire file, [his] opinions regarding the work restrictions remain as outlined in [his] July 16, 2008 report." (Id.)

On May 13, 2010, Dr. Warren David Yu, a board-certified

9

orthopedic surgeon, examined Plaintiff at the Social Security
Administration's request.  (AR 408-11.)  Dr. Yu diagnosed
myofascial neck and back pain, upper-extremity myofascial pain,
and anterior knee pain.  (AR 411.)  He opined that Plaintiff
would be able to sit, stand, or walk for up to six hours in an
eight-hour day; lift 20 pounds occasionally and 10 pounds
frequently; and frequently use his upper extremities for pushing,
pulling, fine motor finger movements, handling, and fingering.
(Id.)

On May 26, 2010, Dr. G. Taylor-Holmes, who specialized in
internal medicine,[7] reviewed Plaintiff's medical records and
completed a physical-residual-functional-capacity assessment.
(AR 412-16.)  He noted Plaintiff's primary diagnoses as
myofascial cervical-spine and lumbar-spine pain syndrome and his
secondary diagnoses as history of carpal tunnel syndrome and knee
strain.  (AR 412.)  Dr. Taylor-Holmes opined that Plaintiff could
lift 20 pounds occasionally and 10 pounds frequently, stand and
walk about six hours in an eight-hour day, sit about six hours in
an eight-hour day, and perform unlimited pushing and pulling.
(AR 413.)  The doctor believed that Plaintiff was limited to
"frequent" handling and fingering.  (AR 414.)  Dr. Taylor-Holmes
noted that those findings were consistent with Dr. Yu's.  (AR
416.)  On January 7, 2011, Dr. M. Bayar, who specialized in

---

[7]Dr. Taylor-Holmes's electronic signature includes a medical
specialty code of 19, indicating internal medicine. (AR 416); see
Program Operations Manual System (POMS) DI 26510.089, U.S. Soc.
Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/
0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29,
2012), https://secure.ssa.gov/poms.nsf/lnx/0426510090.

surgery,[8] reviewed Plaintiff's medical records and affirmed Dr. Taylor-Holmes's decision.  (AR 457-58.)

On January 26, 2012, Plaintiff's treating physician, Dr. Felix A. Albano, noted that Plaintiff suffered from "Herniated Disc Diseae [sic] of the Cspine and Lumbosacral spine, Gastro-esophageal Reflux Disease and Helicobacter Pylori."[9]  (AR 484.) Dr. Albano stated, without further explanation, that Plaintiff was "disabled and unable to work."  (Id.)

Finally, on June 30, 2012, Dr. Vincente R. Bernabe, a board-certified orthopedic surgeon, examined Plaintiff at the Social Security Administration's request.  (AR 486-91.)  Dr. Bernabe observed, among other things, that Plaintiff had "multiple Waddell's signs," including severe back pain on "[a]xial loading of the head" and on "[r]otation of the shoulder while keeping the back straight."[10]  (AR 488.)  He noted that "[e]ven the slightest

_____

[8]Dr. Bayar's electronic signature includes a medical specialty code of 45, indicating surgery. (AR 458); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), https://secure.ssa.gov/poms.nsf/lnx/0426510090.

[9]Helicobacter pylori is a bacterium commonly found in the stomach. H. pylori (Helicobacter pylori), WebMD, http://www.webmd.com/digestive-disorders/h-pylori-helicobacter-pylori (last visited Nov. 8, 2014).  "The bacteria's shape and the way they move allow them to penetrate the stomach's protective mucous lining, where they produce substances that weaken the lining and make the stomach more susceptible to damage from gastric acids."  Id.

[10]Waddell's signs are used to detect a nonorganic component of back pain.  Asley Blom et al., A new sign of inappropriate lower back pain, 84 Annals of The Royal Coll. of Surgeons of England 342-43 (2002), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/.  They include overreactions to the examination, widespread superficial tenderness not corresponding to any

palpation of the skin caused severe pain throughout the whole spine." (<u>Id.</u>) He further noted that Plaintiff "had significant symptom exaggeration grabbing his back and hips during [the] examination" and gave "obvious suboptimal effort" on range-of-motion testing. (<u>Id.</u>) Dr. Bernabe diagnosed "[l]umbosacral strain with multiple Waddell's signs and symptom exaggeration and magnification" and found that Plaintiff had no functional limitations. (AR 490.)

After summarizing the medical evidence, including the February 2008 right- and left-knee MRIs (AR 21-22), the ALJ accorded "significant weight" to the opinions of Drs. Kim, Yu, Taylor-Holmes, and Bayar. (AR 25.) She noted that these doctors generally agreed on Plaintiff's limitations but had assessed "some differences in the degree of specific function-by-function limitations," and she "adopted those specific restrictions on a function-by-function basis that are best supported by the objective evidence as a whole." (AR 26.) She "considered" but gave "less weight" to Dr. Bernabe's opinion, finding that "the clinical evidence does actually support more restrictive limitations" than he found.[11] (AR 25.) The ALJ gave "no weight"

---

anatomical distribution, pain on axial loading of the skull or pain on rotation of the shoulder and pelvis together, severely limited straight-leg raising on formal testing in a patient who can sit forward with the legs extended, and lower limb weakness or sensory loss not corresponding to a nerve-root distribution. <u>Id.</u> "Three or more positive signs are strongly suggestive of a non-organic component to the lower back pain." <u>Id.</u>

[11]As noted in Section B below, the ALJ considered Dr. Bernabe's findings of symptom exaggeration in assessing Plaintiff's credibility.

to Dr. Albano's opinion because it was conclusory and in conflict with the other medical opinions, among other reasons.[12]   (AR 24-25.)

### 3.   Analysis

Contrary to Plaintiff's contentions, the ALJ's assessment of the medical evidence and her resulting RFC finding were legally sufficient and supported by substantial evidence.

Plaintiff contends that the ALJ "failed to comment or provide any discussion or analysis regarding what weight if any she is attributing to [Plaintiff's] bilateral meniscus tears" and "misdiagnose[d]" them as "simply strains." (J. Stip. at 5.) But the ALJ in fact fully discussed Plaintiff's knee MRIs, noting that they showed tears of the right and left medial menisceses. (See AR 21-22.) Moreover, in formulating Plaintiff's RFC, she accorded significant weight to the opinion of Dr. Kim (AR 25), who examined Plaintiff's knees (AR 213-14, 240-41), discussed his MRI reports (AR 217), and diagnosed "bilateral knee strains" and "[o]blique tears through the posterior horns of the medial menisci, per MRIs" (AR 216; accord AR 242).   The ALJ also relied on the opinion of Dr. Yu, who examined Plaintiff's knees and made findings consistent with those of Dr. Kim. (Compare AR 409-10 (Dr. Yu's knee examination, finding anterior knee tenderness, "mildly positive grind and inhibition tests," normal range of motion, no instability or effusion, and normal gait, motor strength, and sensation), with (AR 213-14 (Dr. Kim's knee examinations, showing discomfort when attempting to squat and

_____

[12]Plaintiff does not challenge the ALJ's rejection of Dr. Albano's opinion.

infrapatellar tenderness but normal gait, no swelling, and no instability) and 217 (noting that Plaintiff's knee discomfort was "consistent with the MRI studies, revealing tears to the posterior horns of the medial menisci").)  To the extent there were differences among the opinions of the doctors she relied on, the ALJ stated that she had adopted "those specific restrictions on a function-by-function basis that are best supported by the objective evidence as a whole." (AR 26.)  Indeed, as discussed below, Plaintiff does not convincingly point to any medical evidence showing that he suffered from more significant limitations because of his meniscus tears, and his own treating physician listed Plaintiff's conditions as only herniated disc disease of the cervical and lumbosacral spine, gastroesophageal reflux disease, and helicobacter pylori, not any knee condition. (See AR 484.)  Thus, even if the ALJ somehow erred by finding that Plaintiff suffered from "chronic bilateral knee strain," not meniscus tears, it was harmless.  See Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

    Plaintiff further contends that Dr. Kim found that Plaintiff "would require a 10 minute break every hour and a half" and was restricted from "prolonged standing and walking," and that the ALJ erred by failing to include those limitations in her RFC assessment. (J. Stip. at 5-6.)  Dr. Kim, however, never opined that Plaintiff required a 10-minute break after every hour and a half of work.  Rather, he simply noted that Plaintiff's employer had provided modified work that was limited to lifting a maximum of 20 pounds and provided a break every hour and a half, and that

14

such "modified work duties" fell within his previously
recommended work restrictions of avoiding very heavy work
activities, repetitive gripping and grasping, and prolonged
walking or standing. (AR 243.) In doing so, Dr. Kim
specifically affirmed his previously recommended work
restrictions (id.), which did not include any requirement that
Plaintiff be given breaks throughout the day (id.; see also AR
221). The ALJ, moreover, accurately summarized Dr. Kim's
findings. (See AR 22-23.) As such, the ALJ did not err by
omitting from the RFC a limitation to 10-minute breaks every one
and a half hours. See Bayliss, 427 F.3d at 1217 (in assessing
RFC, ALJ need take into account only limitations for which there
was record support).

Moreover, Dr. Kim's finding in the workers'-compensation
context that Plaintiff was precluded from "prolonged" standing
and walking does not appear to be inconsistent with Plaintiff's
RFC for standing and walking six hours in an eight-hour day.
Indeed, California's 1997 Schedule for Rating Permanent
Disabilities in workers'-compensation cases states that a
preclusion from "Prolonged Weight-Bearing" "contemplates ability
to do work approximately 75% of time in standing and walking
position, and requires sitting approximately 25% of time." See
State of Cal. Dep't of Indus. Relations, Div. of Workers' Comp.,
Schedule for Rating Permanent Disabilities 2-19 (Apr. 1997),
available at https://www.dir.ca.gov/dwc/PDR1997.pdf; see also
Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576
(9th Cir. 1988) (noting that different measurements and
terminology are used in workers' compensation and social security

disability cases); <u>Jones v. Astrue</u>, No. EDCV08-1001-CT, 2008 WL 5351631, at *5 n.9 (C.D. Cal. Dec. 18, 2008) (finding limitation to standing and walking six out of eight hours consistent with doctors' finding, in context of workers'-compensation case, that plaintiff was precluded from "prolonged standing").[13]   The ALJ's interpretation of Dr. Kim's opinion, moreover, is fully consistent with the credited opinions of examining physician Yu and consulting physicians Taylor-Holmes and Bayar, all of whom found that Plaintiff could stand and walk for six hours in an eight-hour day.  (<u>See</u> AR 411, 413, 458.)  The ALJ therefore did not err by failing to include in Plaintiff's RFC and the hypotheticals to the VE any further limitations on his ability to stand and walk.  <u>See</u> <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."); <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final arbiter with respect to resolving ambiguities in the medical evidence").

Plaintiff is not entitled to remand on this ground.

---

[13]Although the term "prolonged weight bearing" was omitted from the January 2005 Schedule for Rating Permanent Disabilities, <u>see</u> State of Cal. Dep't of Indus. Relations, Div. of Workers' Comp., <u>Schedule for Rating Permanent Disabilities</u> (Jan. 2005), <u>available at</u> https://www.dir.ca.gov/dwc/PDR.pdf, the Court uses the 1997 version for guidance.

B.   <u>The ALJ Did Not Err in Assessing Plaintiff's
     Credibility</u>

Plaintiff contends that the ALJ failed to give any clear and convincing reasons for "rejecting" his subjective complaints. (J. Stip. at 9-13.)  For the reasons discussed below, reversal is not warranted on this ground.

1.   <u>Applicable law</u>

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina</u>, 674 F.3d at 1112 (internal quotation marks omitted).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  <u>Id.</u> at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th

17

Cir. 2010).

Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Lester</u>, 81 F.3d at 834.[14] If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th Cir. 2002).

### 2.   Relevant facts

In an undated disability report, Plaintiff alleged that he had been unable to work since October 10, 2008, because of a "[b]ack and leg[] injury," "numbness in both hands," and "headaches." (AR 165.) At the January 2012 hearing, Plaintiff testified that he was unable to work because of back pain. (AR 39.) He could not move his arms without having pain in his back and shoulders, his hands and legs were numb, and he had neck pain "[o]ff and on." (AR 39-40, 46-47.) Plaintiff could lift about 15 pounds but could not carry that weight for very long, and he could not write a one-page letter holding a pencil because of hand numbness. (AR 41-42.) He could stand only 15 minutes at a time because his back would start to hurt (AR 44-45), and he could sit for only 10 to 15 minutes at a time (AR 51). Plaintiff spent about four hours a day resting in a recliner. (AR 51-52.)

---

[14]In <u>Ghanim v. Colvin</u>, the Ninth Circuit noted that its precedent was inconsistent on whether the "clear and convincing" standard does not apply only when an ALJ makes an "actual finding of malingering" or also when the record merely contains "evidence of malingering." 763 F.3d 1154, 1163 n.9 (9th Cir. 2014). The Ninth Circuit declined to decide the issue, however. <u>Id.</u> Here, as discussed below, because the ALJ made a finding of malingering, she was relieved of the obligation to provide clear and convincing reasons under either iteration of the standard.

On a "good day," Plaintiff would walk about a half block, which
would take about a half hour, or shop with his wife.  (AR 48-50.)
On a bad day, Plaintiff would "relax" and spend almost all day in
a recliner or in bed.  (AR 49, 53.)  He testified that "[e]very
movement of [his] body cause[d] [him] pain."  (AR 54.)  Plaintiff
also testified that since his alleged onset date, in October
2008, he had applied for jobs and received unemployment benefits.
(AR 55-56.)

### 3.   Analysis

The ALJ found that Plaintiff's medically determinable
impairments could reasonably be expected to cause some of the
alleged symptoms, but that his "statements concerning the
intensity, persistence and limiting effects of these symptoms are
not credible to the extent they are inconsistent with" his RFC
for light work.  (AR 20.)  As discussed below, the ALJ gave
legally sufficient reasons for discounting Plaintiff's
credibility.

As an initial matter, the ALJ was entitled to reject
Plaintiff's testimony without providing clear and convincing
reasons because she specifically found that "the record includes
statements by a doctor suggesting [Plaintiff] was engaged in
possible malingering or misrepresentation," undermining
Plaintiff's credibility.  (AR 20); see Benton ex. el. Benton v.
Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003) (ALJ can reject
claimant's testimony only upon "(1) finding evidence of
malingering, or (2) expressing clear and convincing reasons for
doing so"); Flores v. Comm'r of Soc. Sec., 237 F. App'x 251, 252-
53 (9th Cir. 2007) (ALJ did not err in rejecting subjective pain

testimony when record contained affirmative evidence of malingering "in abundance").  Indeed, as the ALJ found (AR 20), Dr. Bernabe examined Plaintiff and found "multiple Waddell's signs," including severe back pain on axial loading of the head and on rotation of the shoulder while keeping the back straight (AR 488).  Plaintiff also displayed "significant symptom exaggeration[,] grabbing his back and hips during [the] examination," and "[e]ven the slightest palpation of the skin caused severe pain throughout the whole spine."  (Id.)  Dr. Bernabe further noted that Plaintiff gave "obvious suboptimal effort" on range-of-motion testing of the lumbar spine.  (Id.) He diagnosed lumbosacral strain "with multiple Waddell's signs and symptom exaggeration and magnification."  (AR 490.)  The ALJ reasonably concluded that Dr. Bernabe's findings "detract from [Plaintiff's] credibility."  (AR 20.)

Plaintiff contends that the ALJ should not have relied on Dr. Bernabe's findings of symptom magnification because he did not review Plaintiff's MRI, EMG, and nerve-conduction-study reports.  (J. Stip. at 12-13.)  But Dr. Bernabe based his conclusion on his own findings of Waddell's signs, exaggeration, and obvious lack of effort during his examination, not any lack of corroborating evidence.  Substantial evidence therefore supports the ALJ's finding of malingering, and she was entitled to discount Plaintiff's credibility on that basis.

In addition, and although the finding of malingering obviated the need to do so, Lester, 81 F.3d at 834, the ALJ provided clear and convincing reasons for discounting Plaintiff's allegations regarding his symptoms and limitations.

1    First, the ALJ found that Plaintiff had received only
2 conservative treatment for his allegedly disabling conditions.
3 (AR 20); see Tommasetti, 533 F.3d at 1040 (holding that
4 claimant's response to conservative treatment undermined his
5 reports of disabling symptoms); Parra, 481 F.3d at 751 (noting
6 that "evidence of 'conservative treatment' is sufficient to
7 discount a claimant's testimony regarding severity of an
8 impairment").  Indeed, Plaintiff testified that he took the
9 medications Norco and Naprosyn[15] (AR 50) and that his doctors did
10 not recommend that he undergo surgery (AR 47).  Dr. Kim,
11 moreover, opined that Plaintiff would require only "additional
12 orthopaedic consultation and treatment for flare-ups, with the
13 treatment most likely consisting of symptomatic medication such
14 as light analgesics, nonsteroidal anti-inflammatory medication,
15 and muscle relaxants, as well as up to 24 sessions of physical
16 therapy per year for any type of acute flare-up of symptoms."
17 (AR 222.)  He found that Plaintiff was "not in need of surgical
18 intervention in relation to his low back complaints."  (AR 217.)
19 Dr. Kim noted that Plaintiff may possibly require pain injections
20 in the future, and that he could not "rule out" future knee
21 arthroscopic surgery (AR 222), but nothing indicates that
22 Plaintiff's doctors ever recommended such treatment or that he

23

24        [15]Norco contains acetaminophen and hydrocodone.  Hydrocodone
25 Combination Products, MedlinePlus, http://www.nlm.nih.gov/
   medlineplus/druginfo/meds/a601006.html (last updated Oct. 15,
26 2014).  Hydrocodone is an opiate (narcotic) analgesic used to
   relieve pain.  Id.  Naprosyn, or Naproxyn, is a nonsteroidal
27 anti-inflammatory drug used to relieve pain.  Naprosyn,
   MedlinePlus, WebMD, http://www.webmd.com/drugs/2/drug-1705-1289/
28 naprosyn-oral/naproxen-oral/details (last accessed Nov. 8, 2014).

1  ever underwent it.  Indeed, Plaintiff's medical records show that

2  since his alleged disability onset date, he was prescribed only

3  Vicodin[16] and Tylenol for his allegedly debilitating low-back

4  pain.  (See AR 471, 473, 481.)[17]  The ALJ therefore permissibly

5  discounted Plaintiff's credibility based on his conservative

6  treatment.[18]  See Stephenson v. Colvin, No. CV 13-8303-AGR, 2014

7  WL 4162380, at *9 (C.D. Cal. Aug. 20, 2014) (ALJ properly

8  discounted credibility based on plaintiff's conservative

9  treatment, which included Vicodin but did not include surgery or

10 pain-relief injections for back impairment); Morris v. Colvin,

11 No. CV 13-6236-OP, 2014 WL 2547599, at *4 (C.D. Cal. June 3,

12 2014) (ALJ properly discounted credibility when plaintiff

13 received conservative treatment consisting of physical therapy,

14 use of TENS unit, chiropractic treatment, Vicodin, and Tylenol

15 with Vicodin); compare Lapeirre-Gutt v. Astrue, 382 F. App'x 662,

16 664 (9th Cir. 2010) (treatment with narcotic pain medication,

17 occipital nerve blocks, triggerpoint injections, and

18 cervical-fusion surgery not conservative).

19      The ALJ also permissibly discounted Plaintiff's subjective

20

21

22      [16]Vicodin contains hydrocodone and acetaminophen.  Hydrocodone

23 Combination Products, MedlinePlus, http://www.nlm.nih.gov/
   medlineplus/druginfo/meds/a601006.html (last updated Oct. 15,
   2014).

24      [17]The notes from Plaintiff's treatment at LaSalle Medical

25 Clinic are largely illegible.  (See, e.g., AR 451, 470, 474.)

26      [18]The ALJ did not, as Plaintiff contends, suggest that "some

27 form of surgery is required in order to qualify for benefits."  (J.
   Stip. at 10.)  Rather, she merely observed that Plaintiff did not

28 undergo surgery, which supported her finding that he received only
   conservative treatment.

complaints because they were inconsistent with the medical
evidence.  (AR 20); see Carmickle v. Comm'r, Soc. Sec. Admin.,
533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the
medical record is a sufficient basis for rejecting the claimant's
subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in
determining credibility, ALJ may consider "whether the alleged
symptoms are consistent with the medical evidence"); Burch v.
Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of
medical evidence cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis.").  Plaintiff claimed to be so debilitated
by his conditions that he was unable to lift more than 15 pounds,
stand for more than 15 minutes, or sit for more than 15 minutes,
and he needed to spend a minimum of four hours a day lying in a
recliner because of back pain.  (AR 41-42, 44-45, 51-52.)  But as
discussed above, Dr. Kim examined Plaintiff and reviewed his
medical records, back MRIs, knee MRIs, and electrodiagnostic
studies and opined that Plaintiff need only avoid "very heavy
work activities," "repetitive forceful gripping, grasping, or
torquing," and "prolonged standing and walking."  (AR 217, 221.)
Similarly, examining physician Yu and consulting physicians
Taylor-Holmes and Bayar all found that Plaintiff could sit,
stand, or walk for six hours in an eight-hour day; lift 20 pounds
occasionally and 10 pounds frequently; and frequently use his
upper extremities for pushing, pulling, and fine motor movements.
(See AR 411-18, 458.)  And although Plaintiff's treating
physician, Dr. Albano, believed that Plaintiff was "disabled and
unable to work," he provided no assessment of Plaintiff's

specific limitations.  (AR 484.)  The ALJ therefore permissibly discounted Plaintiff's credibility in part because his testimony was unsupported by the medical evidence.

Finally, the ALJ discounted Plaintiff's credibility because he worked with modified duties from the time of his July 2007 injury until October 2008.  (AR 20.)  Indeed, Plaintiff alleged that he stopped working on October 10, 2008, "[b]ecause of his condition(s)" (AR 165), but he reported to Dr. Kim that he stopped working because "modified work activities were no longer available" (AR 243).  Cf. Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (as amended) (ALJ properly discounted credibility when plaintiff left job because he was laid off, not because he was injured).  Indeed, even after Plaintiff stopped working, he held himself out as available for work by receiving unemployment benefits and applying for jobs.  (AR 19 (ALJ's notation that Plaintiff received unemployment benefits and applied for jobs), 55-56 (Plaintiff's testimony)); see Carmickle, 533 F.3d at 1161-62 (noting that applying for unemployment benefits can be inconsistent with disability because one has to hold oneself out as available to work).  Plaintiff contends that the ALJ improperly relied on this factor because the fact that he could perform modified work did not mean that competitive occupations existed that would accommodate those same limitations.  (J. Stip. at 10-11.)  But even if the ALJ erred in relying on this factor, it was harmless because she affirmatively found malingering and provided other clear and convincing reasons for discounting Plaintiff's credibility.  See Carmickle, 533 F.3d at 1162-63 (ALJ's reliance on erroneous reasons for adverse credibility

24

1  determination harmless when substantial evidence supported
2  determination and errors did not negate its validity).[19]

3      This Court may not second-guess the ALJ's credibility
4  finding simply because the evidence may have been susceptible of
5  other interpretations more favorable to Plaintiff.  See
6  Tommasetti, 533 F.3d at 1039.  The ALJ reasonably and properly
7  discredited Plaintiff's testimony regarding the severity of his
8  symptoms and gave clear and convincing reasons for her adverse
9  credibility finding.  Reversal is therefore not warranted.

10      C.   The ALJ and VE Properly Classified Plaintiff's Past
11           Relevant Work

12      Plaintiff contends that the VE misclassified one of his past
13  jobs as "extension edger" and that the ALJ's reliance on that
14  testimony to find that Plaintiff could perform his past work as
15  generally performed was therefore in error.  (J. Stip. at 17-18.)

16           1.   Applicable law

17      At step four of the five-step disability analysis, a
18  claimant has the burden of proving that he cannot return to his
19  past relevant work, as either actually or generally performed in
20  the national economy.  Pinto v. Massanari, 249 F.3d 840, 844-45
21  (9th Cir. 2001); § 404.1520(e).  Although the burden of proof
22  lies with the claimant at step four, the ALJ still has a duty to
23  make factual findings to support her conclusion.  Pinto, 249 F.3d

24

25      [19]The Commissioner contends that the ALJ properly discounted
26  Plaintiff's credibility based on his reported daily activities.
   (J. Stip. at 15-16.)   In fact, the ALJ found that Plaintiff's
27  reported daily activities supported the credibility of his claimed
   limitations, but that this factor was outweighed by the others that
28  detracted from his credibility.  (AR 20.)

at 844.   The ALJ can meet this burden by comparing the physical and mental demands of the past relevant work with the claimant's actual RFC.   Id. at 844-45.

To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on information from the Dictionary of Occupational Titles ("DOT") or VE testimony.   Id. at 845-46; SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000) (at steps four and five, SSA relies "primarily" on DOT "for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is *usually* performed in the national economy." (emphasis in original)).

### 2.   Relevant facts

In a work-history report, Plaintiff described three previous jobs as a "machine operator" and one as a "general helper."   (AR 175-80.)   Plaintiff wrote that in his most recent machine-operator job, he operated a glue machine; he set it up to "work in gluing cardboard boxes together," loaded the machine, supervised two assistants, and cleaned the machine and area at the end of the day.   (AR 176.)   In each workday, Plaintiff walked for four hours, stood for eight hours, stooped for two hours, kneeled for one hour, crawled for one hour, handled objects and reached for eight hours, and handled small objects for four

26

hours.[20]  (Id.)  He lifted up to 50 pounds and frequently lifted

25 pounds.  (Id.)

In an undated and unsigned "Medical/Vocational Decision

Guide," an unidentified state-agency employee found that

Plaintiff was limited to light work with frequent "gross handling

& fingering."  (AR 72.)  He or she classified Plaintiff's past

relevant work as "machine operator," listing a DOT code of

641.685-054, and "general helper," listing a DOT code of 641.686-

014.  (Id.)  Both jobs listed an "M," presumably indicating

medium work.[21]  (Id.)  The employee checked that Plaintiff was

unable to perform his past relevant work but could perform other

work, listing three unskilled light-exertion jobs.[22]  (AR 72-74.)

Under the heading "Medical/Vocational Decision," the employee

checked "not disabled."  (AR 73.)  Plaintiff's application was

denied on that basis at the initial and reconsideration levels.

(AR 77-80, 82-86.)

At the hearing, the VE categorized Plaintiff's past jobs as

a machine feeder, DOT 699.686-010, extension edger, 641.685-046,

and cylinder-die-machine operator, DOT 649.682-014.  (AR 60.)

She testified that the DOT classified the extension-edger job at

the light-exertion level but that Plaintiff had performed it at

---

[20]It is not clear how Plaintiff managed to do all of these
things for the indicated times in one work day.

[21]"Medium work involves lifting no more than 50 pounds at a
time with frequent lifting or carrying of objects weighing up to 25
pounds."  § 404.1567(c).

[22]Specifically, the employee found that Plaintiff could perform
the jobs of collator operator, DOT 208.685-101; cleaner,
housekeeping, DOT 323.687-014; and photocopy-machine operator,
207.685-014.  (AR 74.)

the medium-exertion level.  (Id.)  The VE further testified, in response to the ALJ's hypothetical, that a person with Plaintiff's RFC could perform the extension-edger job "as described by the DOT, not as [Plaintiff] performed [it]."  (AR 60-61.)  She also found that such a person could perform other light-exertion jobs, such as bench assembler, DOT 706.684-042, inspector and hand packager, DOT 559.687-074, and cleaner-housekeeper, DOT 323.687-014.[23]  (AR 62.)  Plaintiff's counsel questioned the VE regarding some of her findings and posed alternative hypotheticals, but he did not challenge her characterization of Plaintiff's previous job as an extension edger or point to the state-agency employee's findings in the Medical/Vocational Decision Guide.  (See AR 63-69.)

Based on the VE's testimony, the ALJ concluded at step four that Plaintiff could perform his past work of extension edger as generally performed in the regional and national economies.  (AR 26.)  She therefore concluded that he was not disabled.  (AR 26-27.)

### 3.   Analysis

Plaintiff contends that the VE's categorization of his past work as an extension-edger was erroneous because it "incorrectly describes Plaintiff's past relevant work as a machine operator where he in fact operated a machine that actually made the boxes themselves, and which required him to lift entire bundles of

---

[23]The VE testified that 2500 bench-assembler positions existed regionally and 35,000 nationally, 900 inspector-and-hand-packager positions existed regionally and 18,000 nationally, and 5500 cleaner-housekeeper jobs existed regionally and more than 70,000 nationally.  (AR 62.)

finished boxes weighing as much as 50 pounds." (J. Stip. at 17-18 (citing AR 176).)   Plaintiff contends that "[a]t no time did [he] perform an occupation where he simply glued a small piece of cardboard onto a pre-made box," as allegedly required by the extension-edger job. (<u>Id.</u> at 18.)   Plaintiff also asserts, without any elaboration, that the state-agency vocational decision properly identified Plaintiff's past relevant work as a machine operator with a DOT code of 641.685-054. (<u>Id.</u>)

The DOT defines the extension-edger job as light work that involves "[e]xerting up to 20 pounds of force occasionally" and "up to 10 pounds of force frequently." DOT 641.685-046, 1991 WL 685589.   In that job, an individual

> [t]ends machine that glues oversized piece of cardboard (extension piece) to box top or bottom to form decorative protecting edge or flange around box: Loads cardboard pieces into machine feed hopper, fills glue reservoir, and starts machine.   Positions formed box on block and presses pedal to activate machine that glues piece onto box.   Removes box from machine and stacks on pallet for wrapping.

<u>Id.</u>

The VE's classification of Plaintiff's past relevant work as an extension edger is consistent with Plaintiff's description of his former job.   Plaintiff stated that his most recent machine-operator job involved operating a glue machine to "glu[e] cardboard boxes together," setting up and loading the machine, supervising assistants, and cleaning the machine at the end of the day. (AR 176.)   The extension-edger job similarly involved

filling a glue machine with glue, loading cardboard into the machine, activating the machine to apply glue, and removing the box from the machine; the machine glues the pieces, not the person, just as Plaintiff testified his prior work involved.  DOT 641.685-046, 1991 WL 685589.  And although Plaintiff stated that in that job he lifted up to 50 pounds and frequently lifted 25 pounds (AR 176), the VE accommodated that statement by testifying that Plaintiff had performed that job at the medium level but that given his RFC limitations, he could perform it only as generally performed, at the light level (AR 60-61).

Plaintiff's description of his most recent job, moreover, was not consistent with the machine-operator job noted in the state-agency Medical/Vocational Decision Guide.  (See AR 72-74.) The DOT describes that job, which is titled "four-corner-stayer-machine operator," as medium work involving "[e]xerting 20 to 50 pounds of force occasionally" and "10 to 25 pounds of force frequently."  DOT 641.685-054, 1991 WL 685591.  An individual in that job

[t]ends machine that folds and tapes corners of cardboard box blanks to form containers: Bolts box form to machine ram, using wrench, and adjusts walls of well to correspond to size of box form.  Places reels of tape on machine feedrack and threads tape through feed and moisture rolls.  Starts machine and loads scored box blanks into automatic feedrack.  Examines boxes to detect defects as they are ejected from machine and stacks boxes on pallets or in bins.  May tend wrapping machine that glues wrappers onto boxes [WRAPPING-MACHINE OPERATOR

30

1   (paper goods)].

2   Id.  Plaintiff never stated that his most recent machine-operator

3   job involved operating a machine that folds and tapes boxes,

4   bolting forms to the machine using a wrench, loading the machine

5   with tape, or loading box blanks.  (See AR 176.)  The ALJ

6   therefore reasonably relied on the testimony of the VE – rather

7   than the opinion of an unidentified state-agency employee of

8   unknown credentials – to find that Plaintiff's past relevant work

9   was that of an extension edger, particularly given that Plaintiff

10  never objected to the VE's characterization of his past work.

11  See Bayliss, 427 F.3d at 1218 (finding that "VE's recognized

12  expertise provides the necessary foundation for his or her

13  testimony," and "no additional foundation is required").

14      Plaintiff nevertheless contends that the VE's testimony was

15  in error because he did not "simply glue[] a small piece of

16  cardboard on to a pre-made box as is described in the extension

17  edger job."  (J. Stip. at 18.)  But the DOT description actually

18  states that the job involves "[t]end[ing] [a] machine" that glues

19  "oversized," not small, pieces of cardboard to boxes.  DOT

20  641.685-046, 1991 WL 685589.  Moreover, that description does not

21  appear to be materially inconsistent with Plaintiff's report that

22  he operated a glue machine to "glu[e] cardboard boxes together."

23  (AR 176.)[24]

24

25      [24]In any event, even if the ALJ had erred in finding that

26  Plaintiff could perform his past relevant work as an edger as
    generally performed, it was likely harmless given the VE's

27  testimony that he could also perform three other jobs that existed
    in significant numbers in the regional and national economies.

28  (See AR 62); Stout 454 F.3d at 1055.

In sum, the ALJ's reliance on the VE's testimony was reasonable, especially in light of Plaintiff's failure at the hearing to object to the VE's categorization of his past work, question the VE about her opinion regarding Plaintiff's past relevant work, or even point out the contradictory state-agency decision guide. (See AR 63-69); see also Solorzano v. Astrue, No. EDCV 11-369-PJW, 2012 WL 84527, at *6 (C.D. Cal. Jan. 10, 2012) (at administrative hearing, counsel has "obligation to take an active role and to raise issues that may impact the ALJ's decision while the hearing is proceeding so that they can be addressed"). Plaintiff is not entitled to remand on this ground.[25]

---

[25]To the extent Plaintiff asserts that the ALJ erred by failing to include in her hypothetical to the VE further limitations supposedly found in Dr. Kim's opinion (J. Stip. at 17), that argument fails for the reasons discussed in Section IV.A.3 above.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[26] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: November 13, 2014

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[26]This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."